**In re Anonymous Nos. 4 and 35 D.B. 79**

Disciplinary Board Docket nos. 4 and 35 D.B. 79.

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania:

GILARDI, *Member,* July 10, 1989 — Pursuant to rule 218(c)(5) of the Pennsylvania Rules of Disciplinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania submits its findings and recommendations to your honorable court with respect to the above-captioned petition for reinstatement.

## HISTORY OF PROCEEDINGS

Petitioner was disbarred with consent, by order of the Pennsylvania Supreme Court, on December 4, 1980. On June 2, 1987, petitioner filed the within petition seeking reinstatement to the bar.

The petition seeking reinstatement was referred to Hearing Committee [ ]. The hearing committee conducted a hearing on February 11, 1988. On January 26, 1989, the hearing committee unanimously recommended reinstatement.

The Office of Disciplinary Counsel objects to petitioner's reinstatement on two grounds. Disciplinary Counsel contends that petitioner is not morally qualified to resume practice. Disciplinary Counsel also takes the position that the petitioner did not comply with rule 217, Pa.R.D.E. The case was briefed and oral argument was requested and scheduled.

On March 29, 1989, oral arguments were presented to a three-member panel of this board. The panel made its report and recommendation to the

board at its April 7, 1989 meeting. This board, after an extensive and complete review of the entire record, including the report, findings and recommendation of the hearing committee, voted unanimously to recommend that the instant petition for reinstatement be granted.

## FINDINGS OF FACT

The Disciplinary Board hereby adopts the findings of fact of the hearing committee. The facts are as follows:

(1) Petitioner, [  ], is an adult individual residing at [  ].

(2) Petitioner is age 42, having been born November 2, 1946 at [  ].

(3) Petitioner is married to the same individual to whom he was married at the time of his disbarment. He does not have any children.

(4) Petitioner graduated from [  ] University Law School, [  ], Pennsylvania, in May 1972 with an LL.B. degree.

(5) On October 21, 1972, petitioner was admitted to the practice of law before the Supreme Court of Pennsylvania and was subsequently assigned Attorney Identification no. [  ].

(6) Petitioner initially engaged in the practice of law in approximately April 1973 in association with [A], a sole practitioner, and as a part-time assistant public defender for [  ] County, Pa., maintaining his offices at [  ] County, Pa.

(7) On or about October 1973, petitioner established his own private law office at [  ], Pa., and continued to serve as assistant public defender for [  ] County through 1976.

(8) From April 1973 to October 1980, petitioner practiced law with an emphasis in criminal law,

representing clients in the criminal courts of [ ] County and its adjacent counties.

(9) During said period, petitioner exhibited skill in his criminal law practice and developed a regional reputation as an effective and competent criminal defense attorney.

(10) During said period, petitioner had a specific interest in criminal law and through application and experience, developed a high degree of competency.

(11) During said period, petitioner regularly undertook to represent civil clients on cases involving a wide variety of substantive law and on many of these occasions, required or was paid nominal retainer fees.

(12) Petitioner's criminal law practice required him to be absent from his law office for extended periods of time including two weeks each month when he was assigned a separate courtroom in [ ] County to process continuously a substantial case load of criminal cases.

(13) During periods of absence from his law office, the office was staffed only by his secretary.

(14) During said period, petitioner accepted more cases, criminal and civil, than he could process efficiently within a reasonable time.

(15) During said period, petitioner, as more fully set forth in his prior disciplinary record, neglected matters entrusted to him (primarily civil matters), for extended periods of time and subsequently lied or misrepresented material facts to clients concerning their cases, permitted statutes of limitation to expire, and otherwise caused clients to be prejudiced or suffer financial losses.

(16) On September 3, 1980, the Supreme Court of Pennsylvania, at no. 257, Disciplinary Docket no. 1 (no. 4 D.B. 79 and no. 35 D.B. 79), issued an order, effective October 2, 1980, immediately sus-

pending petitioner from the practice of law and entered a rule directed to him to show cause why he should not be disbarred.

(17) Petitioner received notice of his suspension on September 10, 1980.

(18) On approximately October 30, 1980, petitioner submitted a voluntary resignation from the Bar of the Supreme Court of Pennsylvania.

(19) Petitioner's resignation referred to the complaint of [B].

(20) Petitioner's resignation did not refer to the complaint of [C].

(21) [C] retained petitioner in early 1978 and while her complaint predates petitioner's resignation, she did not make a complaint to the Disciplinary Board until late 1984 after receiving a notice from [ ] County that she owed personal property taxes on a judgment note she received from petitioner.

(22) By order dated December 4, 1980, filed at no. 257, Disciplinary Docket no. 1, the Supreme Court of Pennsylvania disbarred petitioner pursuant to rule 215 of the Pennsylvania Rules of Disciplinary Enforcement.

(23) Petitioner received notice by letter dated September 10, 1988 from Secretary of the Disciplinary Board of the requirement to comply with Pa.R.D.E. 217.

(24) Petitioner was reminded by letter dated October 17, 1980 from the Disciplinary Board of his failure as of that date to file information verifying his compliance with the rules concerning formerly admitted attorneys.

(25) By letter dated October 21, 1980 petitioner advised the Disciplinary Board:

(A) That his clients had been sent notices or had signed acknowledgments of notices in his office in the course of acquiring their files;

(B) That there were local clients who had failed to come to the office despite numerous phone calls to sign receipts, and certain clients could not be located;

(C) With explanation that he was not in a position to certify that all of his clients had received the requisite notice required upon filing of the suspension order;

(D) That he expected to have the information required to comply with his obligation on Monday, October 27, 1980 at the latest.

(26) On December 9, 1980, petitioner was notified again of his failure to file the required notices and statement of compliance.

(27) By letter dated March 6, 1981 from the Secretary of the Disciplinary Board, petitioner was again advised that the required notices and statement of compliance had not been filed.

(28) By letter of allegation dated September 2, 1982, petitioner was advised by the Office of Disciplinary Counsel of certain allegations, including the allegation that he had failed to comply with Chapter 91, Subchapter E, Formerly Admitted Attorneys, of the Disciplinary Board Rules.

(29) In response to said allegation letter, petitioner under letter dated September 21, 1982, admitted the statement of facts in the allegation letter and offered in mitigation the explanation that subsequent to being suspended, he was required by common pleas trial court to commence an extended murder case and continued the murder case throughout his final 30 days of practice and beyond the effective date of his suspension. In conjunction therewith, the trial court entered an order directing petitioner to conclude the murder case, including post-trial motions, beyond October 2, 1980 when his suspension date became effective.

(30) In his response of September 21, 1982, petitioner again represented that the notices had been sent or made and that carbon paper copies of the same had been retained. He confirmed a prior representation made at an unknown time that the green certified mail return receipt cards had been lost. He represented that he had three separate folders of carbon copies of the notices sent and represented that he was sending the three folders of notices to the Disciplinary Board as evidence of his compliance with the requirement that notice be given to clients.

(31) By letter dated January 21, 1985, the Disciplinary Board advised petitioner of alleged misconduct in connection with legal matters of [C] during the handling of a legal malpractice case covering the period early 1978 to approximately October 22, 1983.

(32) Petitioner admits certain misconduct with respect to [C's] legal case that occurred prior to his suspension, including failure to file the lawsuit within the two-year statute of limitations and falsely representing to the client that it had been filed.

(33) Petitioner admits he continued, subsequent to his disbarment, to engage in misconduct on the [C] matter, including lying and making misrepresentations designed to placate [C] and deter her from filing an additional complaint against him.

(34) Subsequent to his disbarment, petitioner did not represent to client [C] that he had been readmitted, but probably indicated he would be or expected to be readmitted to the practice of law.

(35) Petitioner's client, [C], knew petitioner had been disbarred as a result of reading it in the newspaper and conversations with petitioner.

(36) Petitioner did not send notice of his disbarment to client [C] and continued to hold her file for

an extended period following his suspension/ disbarment, returning it sometime in 1983.

(37) Client [C] suffered pecuniary loss as a result of petitioner's failure to file a malpractice claim against the estate of a deceased lawyer prior to the expiration of the statute of limitations.

(38) The [C] matter involved a personal injury claim that arose in 1976 and was being handled by a [ ] County attorney who subsequently died in 1977. Neither he nor his estate protected the claim.

(39) Client [C] knew petitioner was disbarred but, nevertheless, permitted him to hold her file, did not consult another attorney, continued to consult with him, consulted another attorney in his company, and accepted the meaningless judgment note in lieu of any other action.

(40) Attorney [D] did consult on the case either at the request of [C] or petitioner, but did not accept the case. Petitioner represented to [C] that attorney [D] had agreed to handle the case, which he knew to be a lie.

(41) Attorney [D] advised [C] directly in October 1983 that he was not involved in the case.

(42) On or about October 22, 1983, when confronted by [C], petitioner admitted substantially the true facts of the situation and executed a judgment note in the amount of $500,000 promising to pay it at some future time.

(43) Upon determining petitioner's misconduct in October 1983, [C] did not make a formal complaint.

(44) The substantive value, if any, of [C's] claim for malpractice against the estate of a deceased attorney is unknown. The amount of $500,000 was not a realistic valuation of the malpractice claim.

(45) Petitioner was not able to pay $500,000 at the time he executed the judgment note and had no

reasonable basis to believe that he could pay the sum or any part of it in the future. [C] knew petitioner could not pay it.

(46) On October 22, 1983, in conjunction with the judgment note, petitioner and [C] entered into an agreement that if an insurance company paid [C], the judgment note would be deemed a nullity. At the time that agreement was signed, petitioner did not have any insurance policy which would cover the claim of [C] and any other source of insurance coverage was improbable. There was no realistic basis for the agreement.

(47) In May 1984, [C] received notice that she would have to pay personal property tax on the $500,000 judgment note.

(48) In late 1984, [C] communicated her allegations of petitioner's wrongdoing to the Office of Disciplinary Counsel.

(49) On February 11, 1985, the Office of Disciplinary Counsel received petitioner's handwritten reply, admitting various allegations of misconduct in the [C] matter and admitting various violations.

(50) Petitioner's misconduct in the [C] matter subsequent to his suspension and disbarment was a continuation of the course of conduct in which he engaged for an extended period of time prior to his suspension and which led directly to his suspension/ disbarment.

(51) Petitioner's misconduct appears to have been induced primarily by his preference for criminal trial work as opposed to his seeking pecuniary gain.

(52) Petitioner's conduct prior to suspension is directly related to his poor judgment in accepting minor but difficult civil matters, inexperience, disorganization, and lack of supervision as opposed to seeking personal pecuniary gain.

(53) After receiving notice of his suspension on

September 10, 1980, petitioner picked a jury from September 15 through September 19, 1980 and tried the homicide trial from September 22 through October 6, 1980, instead of undertaking to comply with the applicable rules.

(54) Subsequent to petitioner's suspension, the Court of Common Pleas of [ ] County, Pa., knowing that petitioner had been suspended, nevertheless ordered him to continue to represent the criminal defendant involved in the aforesaid murder trial and to file post-trial motions beyond the effective date of the suspension.

(55) Petitioner's required involvement in the aforesaid murder trial directly interfered with petitioner's ability to comply with Pa.R.D.E. 217 and to personally supervise forwarding of required notices to clients.

(56) Upon receiving notice of suspension on September 10, 1980, petitioner substantially complied with the notice requirement of rule 217 by causing appropriate notice to be given his clients by mail, certified, return receipts requested or in person at his office evidenced by signed receipts.

(57) Substantially all of petitioner's clients received notice of his suspension and from all appearances, their legal interests were protected.

(58) Petitioner did not file copies of the litigation and non-litigation notices of disbarment or suspension sent to his clients as required by Pa.R.D.E. 217(a) and (b) and Disciplinary Board Rule sections 91.91 and 91.92.

(59) As of the hearing date, petitioner had not filed a verified statement of compliance in the form required to be filed pursuant to Pa.R.D.E. 217(d) and Disciplinary Rule section 91.94.

(60) Petitioner did not file the required verification statement immediately following suspension/

disbarment because he was personally devastated by the situation and did not care at the time the statement was due.

(61) The post office return receipts for certified mail, green in color, were lost or misplaced in the transition of closing his office and storing his files.

(62) Prior to a hearing on reinstatement, petitioner located onionskin copies of notices that were in fact sent to a number of clients.

(63) Petitioner did not provide the Disciplinary Board carbon paper copies of notices sent to clients as promised.

(64) At a later date, petitioner represented to the Disciplinary Board that the carbon paper copies of the notices had been misplaced.

(65) At hearing on this matter, petitioner provided a volume of carbon paper copies of the notices representing that they were a part of the total and had just recently been found in a storage room.

(66) The facts set forth in petitioner's reinstatement questionnaire are found to be true and are incorporated herein by reference.

(67) The reinstatement questionnaire includes a statement verified and subject to criminal penalties that the required notices were sent and offers a requested explanation as to deficiencies.

(68) At hearing, petitioner testified under oath that notices were sent to all clients except [C], that receipts and carbon copies were lost or misplaced and that he had recently located a part of the carbon copies, all of which was consistent with the representations made by him to the Disciplinary Board previously.

(69) Upon receiving notice of his suspension, petitioner, nevertheless, dutifully spent over 21 days completing representation of a defendant in a serious homicide case.

(70) Subsequent to the effective date of his suspension, petitioner responded appropriately to the orders entered by the President Judge presiding over said homicide trial.

(71) Two witnesses testified that petitioner, prior to disbarment, had developed a reputation with both of the courts and his peers as a highly skillful criminal practitioner.

(72) Since his disbarment, petitioner has maintained his learning in the law as an investigator and legal assistant.

(73) Petitioner's experience since disbarment has broadened his experience and learning in the law to fields other than criminal law.

(74) Petitioner has been regularly employed since 1984 as a legal assistant on an "as needed" basis by [E], an attorney practicing primarily business law.

(75) Attorney [F] of [ ], Pa., testified that he employed petitioner subsequent to his disbarment to aid him in legal research on criminal cases, appellate cases, and real estate work. The witness testified he judged petitioner highly competent and totally reliable.

(76) Attorney [A] of [ ], Pa., testified petitioner has worked as a legal assistant in the general practice of law with him since 1986 and is knowledgeable in the law, reliable, and trustworthy.

(77) Attorney [A] testified that petitioner enjoys a strong reputation in [ ] County, Pa., for honesty and integrity, despite his past problems, and that he would entrust a matter of importance to petitioner.

(78) [G], a [ ] County practitioner and member of an eight-lawyer law firm in [ ] County, testified that petitioner, prior to disbarment, was an extremely able trial lawyer and was described by the President Judge of [ ] County as an outstanding cross-examiner.

(79) Since his disbarment, petitioner has worked as an investigator and legal assistant on occasion with and for attorney [G] who found his work to be extremely helpful.

(80) Subsequent to disbarment, petitioner has been utilized by the District Attorney's Office of [   ] County to serve subpoenas and has been employed as a special investigator on at least one occasion.

(81) Petitioner has worked for members of the legal profession in the service of process and has been reliable and efficient.

(82) Several attorneys, the prothonotary of [   ] County, and a member of the clergy testified unequivocally that petitioner presently has a good reputation for honesty and integrity.

(83) Presently, petitioner works with Attorney [H] in the preparation of workers' compensation cases.

(84) Several attorneys and members of the [   ] County, Pa., community testified to their belief that readmission of petitioner to the practice of law would be a benefit to the community.

(85) The prothonotary of [   ] County testified that petitioner continues to have a good reputation for honesty and integrity within the county and that she believed his readmission to the practice of law would be an asset to the community.

(86) During his disbarment, petitioner maintained and improved his learning of the law by working for other attorneys in research and preparation of briefs, reading advance sheets and legal periodicals, and attended a recommended seminar at [   ] Law School.

(87) Since disbarment, the Court of Common Pleas of [   ] County has appointed petitioner special investigator twice on behalf of criminal defendants.

(88) Petitioner attributes his past problems to an inability to say no (accepting all cases) and his own ego (he could do it).

(89) Since his disbarment, petitioner has worked with various attorneys on civil RICO violations, criminal cases in both federal and state courts, and analysis and evaluation of workers' compensation claims for an insurance carrier.

(90) Since his disbarment, petitioner has taken positive steps within his means to pay or reduce his outstanding debts.

(91) Two debts remain outstanding that are related to past misconduct, specifically a judgment note in favor of [B] in the amount of $12,500 and a judgment note in the amount of $500,000 payable to [C], referred to above.

(92) There are at least two personal obligations outstanding in a significant amount, one to the Internal Revenue Service for past income taxes and [I] in the amount of $22,000.

(93) Petitioner has been paying the Internal Revenue Service the sum of $250 per month in payment of past due income taxes. He has not paid on the other obligations because of a lack of funds.

(94) If readmitted to the practice of law, petitioner indicates:

(A) That he will not practice as a sole practitioner, but would prefer to be associated with a firm to assure the back-up and timeliness of office-related work;

(B) That courtroom time must be reduced;

(C) That regular contact with staff and other attorneys must be maintained to monitor the status of cases;

(D) That he must be selective in cases accepted.

(95) Petitioner exhibits understanding of the underlying causes that led to his disbarment, including excessive emphasis on trial work, desire for notoriety, lack of candidness with clients, failure to operate

his office in an efficient businesslike way, and failure to confront and honestly resolve problems.

(96) Petitioner exhibits remorse for his past conduct and a resolves to avoid misconduct in the future.

(97) The hearing committee finds petitioner to have been candid in his testimony and his testimony to be highly credible.

(98) Petitioner does not have the financial means to pay his remaining outstanding debts in full prior to readmission and cannot reasonably be expected to have the credit to borrow the necessary funds.

## DISCUSSION

"The primary purpose of our system of lawyer discipline is to protect the public from unfit attorneys and to maintain the integrity of the legal system." *Office of Disciplinary Counsel v. Keller,* 509 Pa. 573, 506 A.2d 872 (1986). To achieve this purpose, sanctions must be imposed on lawyers who have engaged in ethical misconduct.

Disbarment is the most severe sanction that our court can impose on a member of the bar for professional misconduct. Disbarment terminates a lawyer's privilege to practice law for a period of at least five years. Even though disbarment is reserved for the most egregious cases, a disbarred attorney may apply for reinstatement. But "there is no basis for an expectation by the disbarred attorney of the right to resume practice at some future point in time." *Office of Disciplinary Counsel v. Keller, supra.* Simply put, disbarment "represents a termination of the license to practice law without a promise of its restoration at any future time." *Keller, supra.*

Disbarment can be voluntary or involuntary. An involuntary disbarment occurs where the Supreme

Court imposes the sanction of disbarment, for lawyer misconduct, after the case has been litigated through the disciplinary system. Rule 215 of the Rules of Disciplinary Enforcement provides for voluntary disbarment. Rule 215 permits an attorney who is being investigated for professional misconduct to submit his or her resignation as an attorney providing, inter alia, that he or she acknowledges that the material facts upon which the complaint is predicated are true, and he or she agrees that an order of disbarment by consent may be entered by the Supreme Court. See Pa.R.D.E. 215.

Here, petitioner, who was disbarred with consent by order of the Supreme Court, now seeks reinstatement. In order for petitioner to gain reinstatement to the bar of the Supreme Court of Pennsylvania, he has the burden of demonstrating, by clear and convincing evidence, that he has both the moral qualifications and the competency and learning in the law required for admission to practice in this commonwealth. In addition, he has the burden of demonstrating that his resumption of the practice of law will not be detrimental to the integrity and standing of the bar, or the administration of justice, nor subversive of the public interest. See Pa.R.D.E. 218(c)(3)(i).

Because the purpose of lawyer discipline is not punishment, readmission of a disbarred lawyer may be appropriate. When a disbarred attorney seeks reinstatement:

"[T]he threshold question must be whether the magnitude of the breach of trust would permit the resumption of practice without a detrimental effect upon 'the integrity and standing of the bar or the administration of justice nor subversive of the public interest.' Pa.R.D.E. 218(c)(3)(i)." *Office of Disciplinary Counsel v. Keller, supra.*

We start our analysis of the threshold question with the observation that petitioner's problems were caused, in large measure, by his inability to manage his time, his case intake, and his case load. Once his situation became unmanageable, his troubles compounded. When petitioner consented to disbarment, he took his first step towards rehabilitation. The restoration process started with petitioner's acknowledgement of his misconduct. But has the rehabilitation process been completed? The proof of petitioner's rehabilitation is demonstrated by his acknowledgement of his misconduct, his acceptance of responsibility for his misconduct, and his present understanding of the causes of his misconduct. We conclude that the petitioner will now be able to avoid the pitfalls that led to his disbarment. Petitioner's misconduct was serious, but was not so shockingly aberrant and outrageous so as to preclude reinstatement.

We have examined the nature and magnitude of petitioner's underlying misconduct. We have concluded that the record demonstrates by clear and convincing evidence that petitioner has been successfully rehabilitated. As the hearing committee observed: "It is apparent [from the record] that the community in which he practiced and now lives has forgiven his transgressions." Hearing committee report at 36. Accordingly, the board concludes that petitioner's reinstatement will not have a detrimental effect upon the integrity and standing of the bar. Likewise, we conclude that petitioner's reinstatement will not detrimentally affect the administration of justice, and his reinstatement will not be subversive of the public interest.

At this point, we must examine whether the disciplined attorney is now morally fit and technically competent to engage in the practice of law.

The record is clear and convincing that the petitioner possesses the necessary competence to resume the practice of law. In fact, the Office of Disciplinary Counsel does not challenge petitioner's competence. The Office of Disciplinary Counsel acknowledges "that petitioner possesses the requisite competency and learning in the law to be readmitted to practice." Office of Disciplinary Counsel's brief on exceptions at 14.

We must now make an inquiry into the petitioner's moral fitness to resume the practice of law.

Petitioner must prove by clear and convincing evidence that he possess the moral qualifications necessary to practice law, and that his reinstatement will not be detrimental to the integrity of the bar or public interest. Pa.R.D.E. 218(e)(3)(i). At the February 11, 1988 hearing on this matter, petitioner presented a number of witnesses who attested to his high moral character and the benefit that his reinstatement would provide for both the bar and the public. Attorneys [E], [F], [A], [G], and [H], as well as Reverend [J], a Catholic priest, and [K], the prothonotary of [   ] County, testified that petitioner possessed the moral fiber and integrity necessary to practice law. All of these witnesses further stated that petitioner's reinstatement would be beneficial to the bar, and would not be subversive to the integrity of the bar, or detrimental to the public interest in any way.

Attorney [E] testified that he knew of no one who would oppose petitioner's reinstatement, and Reverend [J] characterized petitioner as a "man of integrity."

Disciplinary Counsel did not present any witness who discredited petitioner. Based on our careful examination of the record and the report and recommendation of Hearing Committee [   ], we agree that petitioner has met his burden of proof. The

record clearly and convincingly demonstrates that the petitioner does in fact possess the moral qualifications for reinstatement to the practice of law.

In summary, we believe that the record amply shows that the petitioner has rehabilitated himself over the past eight years, and that he will be able to avoid the pitfalls that led to his misconduct. His conduct was not so egregious that reinstatement should be denied. We conclude that the petitioner is morally fit and technically competent to resume the practice of law.

In passing, it should be noted that the Office of Disciplinary Counsel objects to petitioner's reinstatement because of petitioner's continued misconduct subsequent to his disbarment. The board, as well as the hearing committee, has examined petitioner's conduct during a considerable period of time after disbarment. The post-disbarment misconduct related to only one client. That client sought petitioner's counsel even though she knew that the petitioner had been disbarred. Petitioner was attempting to placate the client concerning misconduct that occurred prior to his disbarment. Thus, the post-disbarment misconduct had its origins prior to petitioner's disbarment. Even though petitioner's post-disbarment misconduct is disturbing, it is not fatal to his petition for reinstatement. Viewing the record as a whole, this instance of post-disbarment misconduct should not ruin an otherwise exemplary rehabilitative effort.

The Office of Disciplinary Counsel also objects to petitioner's reinstatement on the grounds that petitioner did not fully comply with Pa.R.D.E. 217, which requires a lawyer to promptly notify all clients whose cases are pending, and opposing counsel, of the attorney's disbarment, suspension, or transfer to inactive status. The rule also requires the lawyer to

file a verified statement with the board within 10 days stating that rule 217 has been complied with. The rule further requires the attorney to keep records which will prove his compliance with rule 217.

The Office of Disciplinary Counsel contends that petitioner's failure to file a statement of compliance with rule 217, as well as his failure to file copies of notices to clients regarding his suspension, should act as a bar to petitioner's reinstatement. Office of Disciplinary Counsel's Brief to Hearing Committee [ ] at 10.

The hearing committee noted that petitioner was completing a murder trial at the time he should have been complying with Pa.R.D.E. 217. Petitioner was ordered to complete the trial by a common pleas judge. Petitioner "was serving the law, the local court, and the public by concluding a serious criminal case." This does not excuse the petitioner from complying with the rule; however, "[i]t does indicate . . . that his first concern was not necessarily his own welfare." Hearing committee report at 27-8.

The Disciplinary Board must confront the issue faced by the hearing committee: whether petitioner's substantial compliance with Pa.R.D.E. 217 is sufficient for reinstatement. The hearing committee resolved this issue in petitioner's favor. The committee found that petitioner had complied with the spirit of rule 217 because he had notified his clients of his suspension. Hearing committee report at 15. The hearing committee was also satisfied that petitioner's reinstatement questionnaire, which includes a verified statement and subjects petitioner to criminal penalties if falsified, was satisfactory and acceptable evidence that petitioner complied with his duty to notify clients of his suspension. Hearing committee report at 15.

Petitioner did not send a notice of his suspension

to one of his clients. However, the client involved was aware of his suspension. She knowingly chose to continue to seek his advice. We find, therefore, that petitioner substantially complied with all of the rule 217 client-notification requirements.

We further agree that petitioner fulfilled the important objective of the rule: notification of his suspension to his clients. At this point in time, petitioner can never fully comply with the literal mandate of the rule. Again, is petitioner's substantial compliance with rule 217 sufficient to permit his reinstatement?

Petitioner explained at the reinstatement hearing that he was so upset at the time of his suspension that he failed to file the required papers with the disciplinary board. Although this does not excuse petitioner's behavior, it explains his actions.

We concur with the hearing committee that petitioner should be reinstated. We do not dispute that petitioner failed to comply with the strict and precise letter of rule 217. However, reinstatement should not be denied in view of the consequences already visited upon the petitioner and in view of his substantial compliance with rule 217.[*]

Petitioner has demonstrated by clear and convincing evidence that he should be reinstated to the practice of law.

## RECOMMENDATION

The Disciplinary Board of the Supreme Court of Pennsylvania respectfully and unanimously recommends to the Supreme Court of Pennsylvania that the instant petition for reinstatement of [petitioner] to the practice of law in the Commonwealth of

---

[*] Our construction of rule 217 is limited to the facts of the case presently before us.

Pennsylvania be granted by this honorable court, and that the court direct that all necessary expenses incurred by this board in the investigation and processing of the instant petition for reinstatement be borne and paid for by said petitioner.

Messrs. Brown, Douglas, and Stoelker did not participate in the adjudication.

## ORDER

And now, September 12, 1989, upon consideration of the report and recommendations of the Disciplinary Board dated July 10, 1989, the petition for reinstatement is granted.

Pursuant to rule 218(e), Pa.R.D.E., petitioner is directed to pay the expenses incurred by the board in the investigation and processing of the petition for reinstatement.

Mr. Justice Papadakos dissents.